UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    CRIMINAL NO. 10-20676

v.                                      HON. GERALD E. ROSEN

STEVEN DEMINK,
      aka, Dalton St. Clair,

                Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this Sentencing

Memorandum for the Court's consideration in connection with the sentencing

hearing in this case scheduled for August 3, 2011 at 10:00 a.m.  This case involves

the exploitation of numerous children, the manipulation of the mothers of these

children, and a breathtakingly broad scope of criminal conduct by the defendant,

Steven Demink, over the course of two years.  The most sacred relationship in

nature was repeatedly perverted and exploited for the sexual gratification of this

defendant.  The destruction left in Demink's path is immeasurable.  The guidelines

call for him to spend the rest of his life in prison.  For the reasons stated below, the

government agrees and recommends likewise.

# I

## FACTUAL BACKGROUND

On December 17, 2009, at a bus stop in Teton County, Idaho, a grandmother asked her five year-old grandson if he had fun the night before, when he spent time alone with his mother.  The boy surprisingly said no.  The boy told his grandmother that his mother forced him to undress and "sucked on his pee pee." That brave child's disclosure spurred the investigation into a mysterious man named Dalton St. Clair (who really was the defendant Steven Demink) and the landslide of sexual abuse charges in this case.  At final count, seven mothers sexually assaulted 12 children (all but one of which were their biological children), all at the direction and insistence of Demink.  Demink's conduct relative to each mother and the child-victims in this case is outlined below.  But first, to set the context of how Demink manipulated these women, a brief discussion of Dalton St. Clair is in order.

1.   *Dalton St. Clair*

Steven Demink created the online persona of Dalton St. Clair sometime prior to April 2009 on a dating website called singleparentmeet.com.  The

biographical information provided by Demink in the Dalton St. Clair profile spoke to the desires of many single mothers.  St. Clair was young (30 years old), attractive (described on the site as 6' 2" with an athletic build, blue eyes, and brown hair), financially secure (with an annual income listed as $100,000-$200,000 in the bio-pharmaceutical field), and available (St. Clair was looking for a "serious relationship").  In three subsequent paragraphs, Dalton St. Clair answered some of the website's prearranged questions in the "Your Greeting" section:

**A little about me . . .**
I am a pretty laid back person.. I love to laugh (good for the soul), spend time with family and friends, go to movies, nice dinners, clubs, work out, play sports, read, spend time with my daughter . . my interests are varied . . I am a HUGE support of the Arts, and I like to sit for art classes when I get the time (at the local Center for Creative Studies). So much in life interests me it is hard to list them all (sic)

**What are you looking for in a partner?**
I seek someone who is genuine..who has a heart..who has a conscience..who has a soul..friendly, outgoing, drama free..looks, job etc... none of that really matters to me..I want someone I connect with.. Someone that gets me..someone i can be myself around... Because when it all comes down to it, arent (sic) we all looking for someone who we can be a total goofball with and not worry ?? (sic)

**I'd just like to add . . .**
I have used a site like this, so i am pretty new to the whole concept.. I figured, why not..the woman I have been searching for may be

> here..and if I don't try to find her, shame on me!  I love animals, and abhor cruelty of any kind..if you have to hunt to eat, by all means do so..but to hunt a rare species just to have its head on your wall, well I think thats kind of sick.  I still keep in shape as best I can.  I was a gymnast in my college days and old routines kind of die hard.

Besides these traits of loving animals and the arts, staying in shape, and not being interested in a woman's looks, Demink attached several pictures he stole from a male modeling website of a well-built, young, attractive male.[1]

With this fantasy created, Demink–posing as Dalton St. Clair–contacted hundreds of women through the singleparentmeet website.  It is difficult to estimate the exact number of contacts Demink made because Demink used several different screennames.  But under just one of his Yahoo! email addresses, Demink had 1009 chat partners.  Most ignored or chastised Demink when he sought nude pictures of children.  But a persistent Demink found at least the following seven women who succumbed to his desires.

2.   *Rebecca Nail of Virginia and MV #1: April-December 2009*

Demink met Rebecca Nail off of the singleparentmeet website in

---

[1]        A copy of this singleparentmeet.com profile of Dalton St. Clair, including the pictures, will be submitted to the court in chambers as Exhibit 1.  Because the male model depicted in the Dalton St. Clair profile played no role in Demink's horrific crimes, his pictures should not be filed in a publicly-available document.

April 2009.  Demink convinced Nail–the mother of a 15 year-old boy (MV

#1)–that nudity in the home was important to a boy's development.  Over time,

Demink promised a long-term relationship with Nail if she and her son would be

naked in the home, as that is how Demink described himself and his fictitious

daughter "Larissa."  Demink's demands for nudity then warped into demands for

still images and live streaming video of oral sex, vaginal intercourse, and various

other sexual activities between Nail and MV #1.  Nail complied.  Every step of the

way, from the beginning of these so-called "exercises" to the end, Demink directed

the body positions, lightings, and actions of Nail and MV #1.

Despite her compliance with his increasingly disgusting commands, Demink

berated Nail when she reported to Demink that she told MV #1 that they never had

to do any of those sexual acts again.  Demink then demanded Nail retrieve MV #1

and again perform sex acts together.  Never satisfied, Demink criticized Nail and

MV #1 for any darkened lighting or any misstep in the sexual acts.  Demink also

chastised both Nail and MV #1 for not smiling during the activities.

In total, Demink directed and ordered sexual acts on webcam between Nail

and MV #1 on four different occasions, and received more than 100 still images of

the child sexual abuse.  To help with the manipulation, Demink sent images of

5

child pornography of a young, naked girl to Nail, and claimed that the girl was his daughter Larissa.

Earlier this year, Nail pleaded guilty to production of child pornography, and is currently serving a 30-year federal prison sentence for her crimes.  In a letter to the government in anticipation of Demink's sentencing hearing, Rebecca Nail wrote that Demink's promises of a stable family life (Nail had recently lost her job and her home) made her do "everything he wanted me to do, because I didn't want to ruin any chance of the happy little family . . . I so desperately wanted."  Nail wrote that Demink "completely destroyed my son's and my life" and noted that she will never again be allowed to see her son.  She concluded: "I would have never done anything like this on my own."[2]

3.     *Wendy Beighley of Idaho and MVs #2-3: November-December 2009*

As he had earlier in the year with Rebecca Nail, Demink sought out Wendy Beighley of Idaho on singleparentmeet.com.  Beighley, the single mother of a five year-old boy and three year-old girl (MV #2 and MV #3 respectively), received instant messages from Demink (again, posing as St. Clair) that included still

---

[2]     A copy of Nail's letter to the government will be provided to the court in chambers as Exhibit 2.

photographs of himself naked and pictures of a naked girl that Demink purported to be his daughter.  Demink convinced Beighley to sexually assault her five year-old son by performing oral sex on the boy over a webcam while Demink watched here in Michigan.  The sexual assaults occurred on three distinct occasions: December 3, 4, and 16, 2009.

Much as it had been with Nail, Demink's approach with Beighley was condescending, berating, and manipulative.  On November 23, 2009, Beighley and Demink engaged in a two-hour chat session.  Throughout the chat session, Demink attempted to get Beighley to remove her clothes and remove her children's clothes. Frequent problems occurred.  Beighley objected because her mother was present, a few computer hiccups took place, and, at times, Beighley did not act as quickly as Demink insisted.  When Beighley asked how Demink thought this would help, he dismissed her concerns by noting that he has his PhD in psychology and Beighley had no right to ask him about the exercises.  Instead, Demink promised, "I am more than willing to be in a relationship with you . . . long term but I need to know you'll listen to me about this."  When Beighley continued to have problems either getting the children in the room with the webcam or moving too slowly, Demink threatened to end all communications with Beighley, mocking her by saying "you

have no idea what you just blew for you and them with your fear" and "I hope

your (sic) happy, you just blew a chance to have a nice life, and assure it your kids

grew up a lot healthier than they will all because you were too selfish to listen."

And when Beighley relented, Demink promised "you wont (sic) be sorry . . . a

beautiful future for you all is here if you stop being afraid."

On December 3, 2009, a little over a week later, Demink continued the

verbal assault, calling Beighley selfish and asking her to delete him from her

buddy list.  Eventually, Demink convinced Beighley to "finish the exercise," and

gave Beighley detailed, graphic instructions about how she should perform oral

sex on MV #2.  Demink demanded she perform oral sex on MV #2 "until I buzz."

In response to the five year-old's reaction to this activity, Demink promised "if he

calms down, he gets whatever he wants for Xmas.  So does she [Beighley]."  It is

clear from the chats–and subsequent disclosures by the victim and Beighley–that

Demink's berating finally achieved the sexually assaults for which he pressed so

vehemently.

The next day, Demink involved MV #3.  He instructed Beighley to show

MV #3 what Beighley did to MV#2 the day before (i.e., oral sex on MV #2), and

tells Beighley "let her [MV #3] do what you did yesterday."  Demink then

commanded to Beighley: "lay back . . . legs apart and tell them to explore where they came from" and instructed her to have the children touch Beighley's genitals.

Finally, on December 16, 2009, Demink demanded that Beighley perform oral sex on MV #2. Beighley complied again. On this final occasion, Demink even attempted to have MV #2 (the five year-old boy) vaginally penetrate Beighley, but the boy ran off. The following morning, MV #2 disclosed the abuse to his grandmother.

On May 14, 2010, Wendy Beighley was sentenced to 7-20 years in prison for the sexual assaults against her children. She too wrote a letter to the government in anticipation of Demink's sentencing hearing. "My children have been taken from me and my parental rights terminated. I have not been able to have any contact with my children since my arrest. . . . I lost my career that I had worked so hard for, I was working at a hospital as an EMT. I had one semester left of school and would have had an Associates degree as an RN." In attempting to explain her criminal conduct, Beighley described herself as lonely, vulnerable, and emotionally drained. "I knew what he was asking of me was wrong and I hated doing it, but I wanted him to like me. I did what he asked because I wanted to please him." Finally, Beighley stated the obvious: "I know that had I never met

9

'Dalton' or subcumbed (sic) to his persuasion I would not be in prison and would be with my children." [3]

MVs #2-3 now live with a family member who will likely adopt the children.  In a victim impact letter, the children's new guardian noted that "Mr. Demink's crimes have effected my whole family and I."  After discussing the effect that Demink's crimes have had on the children and her, the guardian explained that Beighley's mother's health has suffered and that Demink "has not effected just one or two people but very many lives." [4]

4.    *Candice Miller of Florida and MVs #4-5: April-May 2010*

In March and April of 2010, Demink and Candice Miller met online on the singleparentmeet.com website and had a relationship similar to Nail, Beighley, and the other women.  Miller discussed her two children, a fourteen year-old boy (MV #4) and a nine year-old girl (MV #5).  During some early chat discussions with Demink, Miller disclosed that her son (MV #4) had some behavioral issues. Seizing on Miller's concern, Demink promised a fix that would bring Miller and

---

[3]        Beighley's letter will be submitted to the court as Exhibit 3.

[4]        The victim impact statement of the guardian of MVs #2-3 will be submitted to the court as Exhibit 4.

her children closer together and improve her son's behavior.  Demink, as he had

with other women, explained that he had a PhD in psychology and extensive

training on how to break down barriers between children and their parents.

In March 2010, Miller produced a series of still images of MV #4 and

MV #5 naked and posed in a variety of sexually explicit positions.  She sent the

images to Demink via email.  During a chat session the day after she first

exploited the children, Miller hesitated at producing any more images because

MV #5 may have been physically hurt by the first session.  Miller even sending

images of MV #5's wounds to Demink.  Demink ridiculed Miller's concern.  "I am

tired of the drama, you always have an excuse and when you don't you invent

them.  Blame it on her...on him, anyone but you and you don't want help with your

kids."  Demink continued, "I am tired of being lied to and deceived when I am

trying to do something good for you."  With her will overbore, Miller relented, "I

will make a deal with you to show you I am serious but you have to give me this

one night of nothing so my daughter's bruises can heal some.  I will finish

tomorrow."

The next night, true to her word, Miller sexually assaulted both MV #4 and

MV #5 while taking pictures for Demink.  Just before this occurred, during an

online chat, Demink instructed Miller to "snap [i.e., take photographs] until you finger falls off" and "take a LOT . . . express . . mouth . . hand . . . penis . . . vag." After Miller sent dozens of photographs to Demink, he instructed her to recharge the camera's battery, "and I will tell you what you need to [do to] finish." Demink then sent nude pictures of Dalton St. Clair as well as child pornography pictures of "Larissa" (St. Clair's fictitious daughter) to show MV #4.

Over the next several weeks, Demink demanded and received more pictures of Miller sexually assaulting MVs #4-5. In total, more than 1,000 images were produced of the sexual abuse of MVs #4-5 by Miller. Miller made those images at Demink's direction, and distributed the images to Demink via email.

Earlier this month, Miller pleaded guilty to producing and distributing child pornography. She did so without a plea agreement, and faces 15-30 years on two different production of child pornography counts, 5-20 years on two distribution of child pornography counts, and up to 10 years on a single count of possessing child pornography. Miller's sentencing hearing is scheduled for October 2011.

Miller's parents, who now serve as the guardians of MVs #4-5, described in painful detail the effect Demink's actions have had on their lives. They describe a large, close-knit family torn apart by Demink's crimes. As for MV #4, the

12

"embarrassment, humiliation and guilt continue to haunt him. He believes it is his fault that his mother was sent to prison." The media, Department of Children and Family Services, and whispers of other people in their small town are now a part of everyday life for MVs #4-5 and their family. The guardians–who were in no position financially to raise two young children–now must continue to work and seek financial assistance to raise these children. The letter concludes with a truth that no one can dispute: "Our large family unit is broken and in some ways is irreparable. . . . Life will never be the same for any of us."[5]

5.    *Autumn Marchant of Indiana and MVs #6-7: Early 2009*

Even the least extensive abuse among the victims of Demink–that involving Autumn Marchant and her two children, MVs #6-7–led to devastating consequences for the children and for Marchant. Marchant met Demink in the singleparentmeet.com website. Chat discussions focused on the financial freedom that Demink could provide Marchant and her children if she complied with his demands. Demink's insistence finally let Marchant to stream a live webcam session of her sexual assaults of MVs #6-7 to Demink. Marchant did what

---

[5]    The letter from the guardians of MVs #4-5 will be provided to the court in chambers as Exhibit 5. Accompanying that letter is a restitution calculation, which will be addressed in more detail below.

Demink demanded, including fondling and performing oral sex on her 9 year-old son (MV #6), and having his older sister do the same (MV #7). When Demink demanded more photographs or webcam sessions–as he had done with every other mother–Marchant declined and did not further exploit her children.

Still, the damage was done. Demink attempted to reinitiate discussions with Marchant a few months later, condescendingly telling her that "one day you will see how good [the exercise] was." To this, Marchant replied "well let's see, my son goes around telling little girls to suck him who are like 5 and 6[.] That is not good and my girl gets angry when guys look at her wrong."

Marchant has now been charged with child molestation in Indiana, her children are now with a guardian, and, in all likelihood, she will lose her parental rights.[6]

6.   *Charity Holloway of Georgia and MV #8-9: May-October 2009*

Almost immediately after meeting Charity Holloway of Georgia, Demink promised a life of happiness and security if she took pictures of herself and her 14 year-old daughter (MV #8). Holloway agreed. The next night, when Holloway

---

[6]     Given the current status of her case, the government did not receive any written material from Marchant. The guardian of MVs #6-7 will likely be present at the sentencing hearing to make a victim impact statement to the court.

refused to wake her daughter up in the middle of the night to take naked pictures, Demink berated her and threatened to end the relationship.  Holloway promised to take pictures the following night, and Demink instructed her as follows: "write this down. 10 of you clothed...different outfits... different rooms in your house; 10 of her clothed..different outfits..different rooms in house; 25 of you and her together...NO clothes...front and back...smiling! 25 of her...NO clothes...different rooms in your house...front and back ... smiling.  15 of you...No clothes...different rooms...smiling...front and back; 15 of you and her ... clothed...together...smiling. If you do these tomorrow... I will LITERALLY marry you."

Later during that same conversation, Demink added that Holloway should keep the girl home from school, claiming it would not hurt her and "I have my PhD in this hon, I know what I'm talking about."  When Holloway refused to keep MV #8 home from school, Demink chastised her repeatedly.  Eventually, accepting that MV #8 would not be kept from school in order to make child pornography for Demink, he told Holloway to produce the images when MV #8 returned home from school, reminding her "I can provide her a safe, happy, and financially secure life."

As promised, Holloway took hundreds of pictures of her child, and

15

eventually MV #9, a friend of her daughter.  Throughout the next several weeks, Holloway continued to comply with Demink's increasingly graphic demands. All along, Demink promised both Holloway and MV #8 that he would marry Holloway and move them out of their small Georgia town down to Tampa, Florida where Demink told them he lived.  But Demink never did.  Eventually, MV #8 reported the abuse to a psychologist.  When Holloway told Demink about this disclosure, Demink ceased contacting Holloway.

As for MV #9, Holloway resisted involving this victim because of the sexual abuse she had previously endured and because MV #9 was not Holloway's daughter.  When Demink learned of the prior abuse suffered by MV #9, he grew more insistent that MV #9 be part of the "exercise."  "OMG honey, listen to me and listen REAL good ok.  When that happens [the sexual abuse], you have to rewire her... you have to rewire in her that the human body is natural and not an instrument of hurt and pain.  Nude is the ONLY WAY to do this.  You know that.. And you trusted me and have been happy... continue.. It will help her a LOT... please listen."  Eventually, Demink's persistence in "helping" MV #9 paid off, and MV #9 was victimized again.

16

Earlier this month, Holloway was indicted on several federal child exploitation charges. Like Miller and Nail, Holloway faces a minimum mandatory 15 years in prison on the production charges.

The mother of MV #9 provided a victim-impact statement for the court's consideration.[7] In it, she describes how "devastated" she was to learn of Demink's actions, and how she was "appalled and humiliated for my daughter, myself, and my family. That a person could or would do such evil is beyond me, especially to a child who cannot defend or protect themselves." MV #9's mother concludes:

> Your honor I hope you will think about the families and the children who have suffered at the hands of this man. I hope when you give this man his sentence that you will think of all the damage this man has done to these children, not only for today but for a lifetime.

7. *Monique Leonard of Illinois and MVs #10-11: October-December 2009*

Monique Leonard's two young children, ages 4 and 7 (MVs #10-11), were likewise victimized by Demink. As had the other mothers, Leonard met Demink on singleparentmeet.com, befriended him, and eventually succumbed to his demands for pictures of the young children. Nude pictures, pictures of oral sex, and digital penetration, taken by cell phone, were sent to Demink by Leonard.

---

[7]     A copy of the letter from MV #9's mother will be submitted to the court in chambers as Exhibit 6.

The young girls' lives have never been the same.

As their father writes in his victim-impact statement, "My daughters cry at night because they don't understand why this has happened to them.  Or why they can't see their mother.  They're afraid to be alone, afraid to have the bedroom door closed."  After describing the stress of the influx of agencies, lawyers, counselors, and judges into the children's lives, the father concludes this way:

> I will never be able to understand why someone would like to watch babies being sexually abused or even want to see them without their clothes.  To me there is no lower form of life, than someone that uses the abuse of power to take advantage of a child.  This person may not have touched my daughters, but used his power to cause the mothers of these children to do unbelievable things, to scar these very young minds for the rest of their lives.[8]

Monique Leonard has been charged in state court in Illinois for the sexual assaults she committed on her daughters.  Her case is still pending.

8.    *Deborah Fisher of Oregon and MV #12: January 2010*

In early January 2010, Deborah Fisher of Oregon, who was widowed in July 2008, met Demink on singleparentmeet.com.  She told Demink she was "looking to fall in love."  Demink, as he had done so many times previously, told Fisher of

---

[8]    The father's letter on behalf of MVs #10-11 will be submitted to chambers as Exhibit 7.

the need for children to be raised without clothing and sexually free.  Demink had

little trouble convincing Fisher to remove her clothes, and when he learned that

one of Fisher's children was an autistic, non-verbal, twelve year-old boy

(MV #12), Demink exploited that vulnerability.  Demink told Fisher "let him see,

it is the nicest and healthiest thing you could do... ESPECIALLY if he is Autistic.

... His thoughts are trapped inside, it is the hell of Autism."  Demink claimed to

have a PhD in psychology and to have worked with autistic children previously.

Using MV #12's autism for his own sexual deviancy, Demink told Fisher

that no woman will ever touch her child in a sexual manner and so it was up to her

to let him learn about a woman's body and his own body.  Fisher complied on

numerous occasions over a two-week period.  Demink consistently told Fisher that

she could take her son's pain away by following Demink's directions.  Fisher

committed a variety of sex acts on her son.  All at the behest of Demink.  Fearing

child sexual abuse charges, Fisher stopped following Demink's lead.  Demink

belittled and mocked her for this, and eventually Fisher ceased responding to

Demink.

Fisher is now charged in state court with three counts of Sexual Abuse 1,

one count of Sodomy 1, and four counts of using a child in a display of child

pornography.  The trial in Fisher's case is currently set for October 2011.  In a letter in anticipation of Demink's sentencing hearing, Fisher explained the severity of MV #12's autism, including that the boy requires pull-ups and not regular underwear because he has little control over his bodily functions. Although she now faces criminal charges and is not permitted to see or speak to her children, Fisher worries "that [the children's] sadness and loss at being away from their mom is even more excruciating than the pain and sadness I feel."  As for Demink, Fisher describes him as "cunning and devious, very convincing and extremely manipulative.  My children's . . . lives have been completely changed.  There is nothing that could be done to Mr. Demink that is sufficiently equal to the harm that he has perpetrated by his lies."[9]  MV #12 now lives with his grandparents, whose entirely lifestyle and retirement were altered as a result of Demink's crimes.[10]

9.   *Other Sexually Abusive Conduct by Demink*

Based initially on the investigation in Idaho involving MVs #2-3, Demink's home was searched pursuant to a federal search warrant in September 2010.

---

[9]      Fisher's letter will be provided to the court as Exhibit 8.

[10]      The grandparent's victim-impact statement will be provided as Exhibit 9.

A computer was seized.  A forensic review of the computer revealed that Demink possessed 2100 images of child pornography, and 110 videos of child pornography, on his computer.  Search warrants on his Yahoo! email accounts similarly showed emails containing child pornographic images sent to and from Demink's various Yahoo! accounts.

Nor was the current investigation the first involving Demink's interest in child pornography.  In 2003, Demink's name and credit card information appeared during the investigation of 21 websites selling child pornography on the internet. Demink used his credit card on three different occasions in 2003 to purchase subscriptions to child pornographic websites.  He was not prosecuted for those offenses.

During an interview with ICE agents following the search of his home, Demink provided information about just 3 of the mothers listed above, minimizing his criminal responsibility for each mother.  In fact, he would only admit to sending some "questionable" pictures over the internet.  In what now has become a consistent theme for Demink, he showed no remorse for the effect his crimes had on the women and children involved.  Similarly, a few weeks after the search of his home, when agents arrested Demink at his workplace for these crimes, agents

asked Demink whether he cared that Nail and Miller had been arrested, were likely to lose their parental rights, and be subject to a lifetime on the sex offender registry. Demink simply said "no," and instead complained that the agents arrested him in front of other people at his workplace.

## II

## SENTENCING GUIDELINE CALCULATIONS AND § 3553(a) FACTORS

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

A.   <u>Sentencing Guidelines Range: § 3553(a)(4)</u>

It is undisputed that the Sentencing Guidelines in this case call for a sentence of life in prison.  In fact, the number of victims, the age of his victims (including as young as 3 and 4 years old), and the horrific acts perpetrated by Demink and his cohorts, placed Demink far beyond the highest guideline level in the book.  That is, the offense level portion of the guidelines grid ends at 43, with every offense at that level resulting in a guidelines range of life in prison.  Demink scored out at a 49–six full levels higher than the highest level in the book.

The government understand and appreciates that this Court has been an oft-critic of the sentencing guidelines for child pornography cases.  But this case is not similar to cases involving a collector or viewer of child pornography that have stirred controversy.  Instead, Demink caused the sexual assaults of a dozen children.  Moreover, all of these children, save one, were assaulted by their own mothers at the insistence of and for the sexual gratification of Demink.  While the guidelines for simple possession or receipt of child pornography may be a fruitful ground for reasonable debate, and even an area of disagreement among thoughtful contributors, such debate and disagreement should play no role in the case at bar.  Put more simply, Demink is nothing like the child pornography offenders whose

high guideline ranges give judges pause at the time of sentencing. Demink is a serial child sexual exploiter, a master manipulator, and a man worthy of a guidelines range of life in prison.

B.     The Nature and Circumstances of the Offense: § 3553(a)(1)

The nature and circumstances of the offenses in this case almost defy description. Demink transformed the most fundamentally loving relationship found in nature–that of a mother and her child–into a tool for his own sexual gratification. Demink lied to the mothers involved in his crimes. He preyed on their desire for financial security, companionship, and health for their children. When they resisted, Demink attacked their core insecurities (e.g., financial stability, fitness as a mother, the health of their children, and loneliness). Demink took advantage of every opportunity presented–whether it was a medical condition (such as the autism of MV #12), a history of abuse (as it was for MV #9), or simply a desire for a better life (which was almost a universally sought after)–all so that he could control these women in his pursuit of sexually gratifying pictures.

To be sure, these women are not victims. Each made a decision to sexually exploit their children in order to chase the fantasy that Demink created through Dalton St. Clair. For that decision, each mother will face justice. A few have

already been sentenced to lengthy terms in prison, and all face criminal charges involving sex crimes against children.  They will never see their children again. For their part, the families of these women are left to pick up the pieces.  Some guardians now must raise their grandchildren, or their nieces and nephews, all with previously unplanned for financial and emotional burdens.

And then there are the children.  Sexual abuse standing alone serves as a life change for victims who have to endure it. But these children exploited by Demink suffer even more than most.  In the short term, all were forced to move from their homes, live with different guardians, and many changed schools, while the media, law enforcement, judges, lawyers, and counselors scrutinize their lives. In the long term, these children will likely never see their mothers again.  They will have to endure the same lifetime of pain and emotional trauma as other victims of child sexual abuse, but be unique in that their victimizer was their own mother.  To tell the story of how Demink manipulated their mother into violating the sacred bond between mother and child will be almost an impossible task for these children as they move through life.  As described above, some of the victims in this case have already expressed feeling responsible for their mothers' incarceration.  But the responsibility is not theirs.  It is Steven Demink's.  The government submits that

the nature and circumstances of this case are frankly like no other in the annals of criminal law, and they support a life sentence here.

C.     The History and Characteristics of the Defendant: § 3553(a)(1)

As to the history and characteristics of Demink, those too support a guidelines sentence.  The psychological report offered by the defense includes three striking points that should give this court pause in ever releasing Demink into society.  First, according to his own admissions, Demink has spent the better part of his adult life exploiting children.  Demink admitted to viewing child pornography for nearly a decade.  (Psych. Report at 15).  Demink's involvement in child pornography websites can be independently documented back to 2003, when he was identified as a three-time subscriber to a known child pornography website that was the subject of an ICE investigation.  Given Demink's manipulative personality, the government suggests his interest in sex with children is longer standing than he admitted to Dr. Miller.  Even Dr. Miller, a paid defense expert, described Demink's sexual adjustment as "significantly deviant and, by definition, abnormal."  (Psych. Report at 16).

Second, Demink still will not admit or discuss this sexual interest in children.  Although otherwise open and honest with Dr. Miller, Demink refused to

26

discuss his sexual interest in children.  "Inasmuch as the defendant is not,

presently, able to be honest with himself about his sexual proclivities, he remains

unable to come to terms with this problem and, hence, it follows that he is unable

to develop the necessary insight needed in order to constructively address it."

(Psych. Report at 20-21).  This failure to "constructively address" his sexual

interest in children does not bode well for Demink's rehabilitation.  Nor does it

bode well for the children of this country should the court grant a variance here.

Third, the diagnosis reached by Dr. Miller further supports a sentence of life

in prison.  Dr. Miller described Demink as having "a sexual arousal pattern

characterized by a significantly heightened degree of sexual interest in

prepubescent and adolescent children," as having "predatory behavior," and as a

man "surely motivated by strong pedophilic urges."  (Psych. Report at 17).  While

Dr. Miller fell short of labeling Demink a pedophile, and suggested that

rehabilitation is possible for Demink, those conclusions render his report

internally inconsistent.  The offense conduct, and the description of Demink by

Dr. Miller, all show a man who cannot be trusted to not victimize society's most

vulnerable members.

Besides the characteristics of Demink outlined in Dr. Miller's report, the remainder of Demink's personal characteristics are unremarkable.  He has a job and a supportive family.  But what is clear here is that when not working, Demink spends the majority of his time viewing images of the sexual abuse of children and manipulating women into exploiting their children.  And he does so without remorse.  When it became clear that the Dalton St. Clair lies had been exposed, Demink showed little concern for the families he destroyed.  His principle concern was the appearance of being arrested at work.  Even with time to reflect, as he wrote a statement to probation, Demink champions buying crafts and candy from kids, but never apologizes to any of the victims or co-conspirators.  (PSR ¶ 9).

D.   Seriousness of the Offense, Promoting Respect for the Law, and Ensuring Just Punishment, Deterrence, and Protecting the Public

Section 3553(a)(2) outlines the purposes of sentencing: deterrence, rehabilitation, respect for the law, and punishment.  Crime deserves punishment.  Just punishment to be sure, but punishment nonetheless.  The pain caused by Demink deserves punishment.  Given the scope of the devastation caused by Demink's crimes, the punishment here should be life in prison.

Deterrence and protecting the public go hand-in-hand in this case.  Demink manipulated mothers into committing live-broadcast sex acts against their children while he hid behind the computer screen.  Keeping that arm's length, Demink never had to answer the questions from these presumably confused and hurt children, nor address the physical, emotional, and psychological repercussions that the abuse had on these children.  In his sentencing memorandum, Demink argues for a variance because he never himself sexually assaulted a child.  (Demink Sent. Memo at 6).  To follow that lead, and award a downward variance here, would send a message to like-minded child exploiters that if they can manipulate others to do their bidding, they will receive a break at sentencing.  This should not be the message of this sentence.

Moreover, it is precisely because Demink did not personally touch a child that the public needs protection from this defendant.  What could be more dangerous than a man who could affect the sexual assault of a dozen children from coast to coast–to meet his own selfish sexual desires–without ever having to leave his own house?  There is nowhere to place Demink outside of prison that can reasonably assure the safety of children.

Finally, to promote respect for the law, Demink should not be sentenced outside of the guidelines.  Puppet masters like Demink almost universally receive stiffer sentences than those they control.  In a drug context, the supplier of drugs typically receives more time in prison than the street dealer.  In a murder for hire plot, the hit man is often viewed as less culpable than the person ordering the hit. So should it be here.  To promote respect for the law, Demink is responsible for the carnage of lives in this case.  He should be given the stiffest sentence of all.

To protect the public, provide deterrence, promote respect for the law, and properly punish this man, Steven Demink should be sentenced to life in prison.

E.    Avoiding Unwarranted Sentence Disparities

Section 3553(a)(6) calls for a sentence that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Here, Demink's co-conspirators have already, or will soon, receive severe sentences.  As indicated above, two of the mothers have already been sentenced in this case.  Rebecca Nail is serving a 30-year term in federal prison.  Wendy Beighley is serving a term of 7-20 years in an Idaho state facility. Candice Miller awaits sentencing–which must be a minimum of 15 years in prison–in federal court in Florida.  The remaining four mothers have all been

charged in either state or federal court, and face lengthy prison terms themselves.

And Demink is more culpable than each of these women. None of the women demonstrated a sexual interest in their children prior to meeting Demink. Demink's sexual interest in children dates back a decade. None of these women had sexually assaulted their children (as far as the government is aware) prior to meeting Demink. Demink played a role in the sexual assault of a dozen children through these various mothers. None of the women had images of child pornography on their computers (except those sent by, or sent to, Demink). Demink had more than 2000 images and 110 movies of child pornography on his computer. None of the women engaged in a pattern of sexual abuse of children. Demink did. None of these women would be in prison, none of these children would have been assaulted, but for the actions of Demink. Thus, when compared to his co-conspirators, Demink deserves a much harsher sentence than they received.

But avoiding unwarranted sentencing disparity speaks on a national, not local, level. "Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. . . .§ 3553(a)(6) is there to ensure nationally uniform sentences

among like offenders so as to leave room to depart downward for those defendants who are truly deserving of leniency." *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007) (citations omitted).  Fortunately for the children of this country, there are no offenders quite like Steven Demink.  The need to avoid unwarranted sentencing disparities does not warrant a below-guidelines sentence here.

F.    <u>Restitution</u>

Section 3553(a)(7) calls for a sentence that provides restitution to any victims of the offense.  Here, only the guardians of MVs #4-5 submitted a claim for restitution.  The amount is $103,576, which is the estimated cost of raising two young children that were thrust onto these guardians because of Demink's actions. The government requests that the court order Demink to pay this restitution. Frankly, it is reasonable for Demink to pay a similar sum for each child-victim in this case.

## III

## CONCLUSION

Based on all of the foregoing, the government requests that this court

sentence Steven Demink to life in prison.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

s/Kevin M. Mulcahy

KEVIN M. MULCAHY
HALA Y. JARBOU
Assistant U.S. Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

Date: July 28, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2011, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system which will send

notification of such filing to the following:

Timothy Dinan, Esq.

Also on July 28, 2011, I mailed via Federal Express, the exhibits cited in the
sentencing memorandum herein to Timothy Dinan.

s/Kevin Mulcahy
KEVIN M. MULCAHY
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9713
E-mail: Kevin.Mulcahy@usdoj.gov

34